UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___2/13/2020___

Maria Ruiz,

                                        Plaintiff,

                -against-

Commissioner of Social Security,

                                        Defendant.

1:18-cv-09659 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

On October 19, 2018, Plaintiff Maria Ruiz ("Plaintiff" or "Ruiz") filed this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), and § 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), challenging the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Compl., ECF No. 2.) Presently before the Court are the parties' cross-motions for judgment on the pleadings. (*See* Pl.'s Notice of Mot., ECF No. 16; Comm'r Notice of Mot, ECF No. 20.) For the reasons set forth below, Plaintiff's motion is GRANTED IN PART and DENIED IN PART, the Commissioner's cross-motion is DENIED and the case is remanded for further proceedings.

**BACKGROUND**

I.    **Procedural History**

On May 21, 2015, Ruiz filed applications for DIB[1] and SSI with a disability onset date of August 31, 2014. (Administrative R. ("R."), ECF No. 11, 356-73.) The Social Security Administration

---

[1] To qualify for disability insurance benefits, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Ruiz's DLI is December 31, 2019. (R. 29.)

("SSA") denied Ruiz's applications on August 6, 2015 and Ruiz requested a hearing before an Administrative Law Judge ("ALJ"). (R. 116-124, 133-35.) A video hearing was held before ALJ David Suna on November 8, 2017. (R. 49-91.) In a decision dated December 22, 2017, ALJ Suna found that Ruiz was not disabled. (R. 26-43.) On January 30, 2018, Ruiz requested review of the ALJ's decision by the Appeals Council. (R. 355.) ALJ Suna's decision became the Commissioner's final decision when the Appeals Council denied Ruiz's request for review on August 20, 2018. (R. 1-3.) This action followed.

## II. Non-Medical Evidence

Ruiz was born on July 11, 1969 in the Dominican Republic and was 45 years old on the alleged onset date. (R. 61, 356.) Ruiz graduated from high school in the Dominican Republic. (R. 32, 63.) Ruiz testified that she was "not very good" with English, but took an advanced English class and passed the United States citizenship examination in or around 2011. (R. 32, 59, 63-64.) Ruiz worked as a hair stylist for approximately fourteen years until her alleged disability onset date in August 2014. (R. 55-56.) From approximately 2007 through 2011 she also worked part-time handing out flyers, and between 2011 and 2014 she worked as a child caretaker during the week and as a hair stylist on the weekends. (R. 56-60.)

## III. Relevant Medical Evidence

Between October 2010 through August 2016, Ruiz received treatment at Bellevue Hospital Center for rheumatoid arthritis and otosclerosis (a condition of the ear causing hearing loss).[2] (R. 484-568, 634-83.) Between February 2013 and May 2016, Ruiz also received treatment

---

[2] In November 2010, Ruiz underwent surgery on her left ear, performed by Dr. John Roland, after which she noted improvement in her hearing in the left ear. (R. 547, 549-68.) Ruiz was supposed to undergo the same surgery on her right ear in 2011, and again in 2014, but either missed an appointment or was "lost

at Morrisania Diagnostic & Treatment Center for rheumatoid arthritis, hypertension, sickle cell trait, leiomyoma of the uterus and unspecified deficiency anemia. (R. 461-83, 608-631.) In 2017, she was referred to the Ralph Lauren Center for Cancer Care and Prevention for evaluation and management of sickle cell anemia. (R. 717-72.) She also received treatment in 2017 at the Columbus Center for Medical Rehabilitation and Montefiore Medical Center relating to her rheumatoid arthritis. (R. 684-716, 773-82.) Because Plaintiff's arguments for remand relate primarily to the ALJ's treatment of medical evidence pertaining to her rheumatoid arthritis, the Court focuses on that evidence below.

### A. Bellevue Hospital Center Treatment Records

In February 2012, Ruiz was seen by Dr. Dennis Cardone, M.D., in the sports management department at Bellevue, for evaluation of right elbow pain. (R. 533-34.) An x-ray of Ruiz's right elbow showed osteoarthritis and effusion.[3] (R. 515, 533.) An MRI in May 2012 showed effusion and synovitis.[4] (*See, e.g.*, R. 489.) After a second visit, on May 9, 2012, Dr. Cardone referred Ruiz to rheumatology for follow-up. (R. 497, 531.)

---

to follow up" and it did not occur until May 5, 2015. (R. 545.) Following the second surgery, Ruiz reported mild vertigo, but believed that her hearing was improved. (R. 535.)

[3] "Effusion" of a joint like the elbow means that the joint is swollen and is associated with osteoarthritis. *See Swollen Joints (Joint Effusion)*, WebMD, https://www.webmd.com/arthritis/swollen-joints-joint-effusion (last visited Feb. 12, 2020).

[4] Synovitis is the "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." *Moore v. Commissioner*, No. 13-CV-00168, 2014 WL 630589, at *2 n.5 (S.D.N.Y. Feb. 18, 2014) (quoting Stedman's Medical Dictionary, 1773, 1088, 937 (27th ed. 2000)). A synovial membrane is "the connective tissue [membrane] that lines the cavity of a synovial joint and produces the synovial fluid." *Id*. A synovial joint is "a joint in which the opposing bony surfaces are covered with a layer of hyaline cartilage or fibrocartilage . . . ." *Id*.

Ruiz began seeing Dr. Soumya Reddy for arthritis care in August 2012. (R. 494-96.) Dr. Reddy noted that Ruiz had a marked limitation in the range of motion of her right elbow and decreased range of motion in her neck and shoulders. (R. 495.) Dr. Reddy noted no obvious signs of inflammatory arthritis, but indicated the need to consider seronegative arthritis.[5] (*Id.*) Dr. Reddy ordered x-rays and set a follow-up appointment for three to four weeks. (*Id.*; *see also* R. 518.) In September 2012, Dr. Reddy started Ruiz on 10 mg of methotrexate[6] per week. (R. 491-93.)

In February 2013, Dr. Reddy noted that Ruiz reported experiencing an increase in symptoms after running out of methotrexate in December 2012, but that Ruiz had felt mild improvement of joint pains and no side effects while taking the medication. (R. 488.) Ruiz also reported mild improvement of morning stiffness, which decreased from two or three hours to one hour. (*Id.*) Dr. Reddy noted continued inflammation in Ruiz's right elbow and both shoulders and resumed methotrexate with an increased dose of 12.5 mg per week. (R. 490.) At Ruiz's next appointment in April 2013, Dr. Reddy noted no significant improvement with the increased dose

---

[5] Rheumatoid arthritis is a chronic inflammatory disorder and autoimmune disorder that affects the lining of a person's joints, causing painful swelling that can result in bone erosion and joint deformity. *See Rheumatoid Arthritis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/symptoms-causes/syc-20353648 (last visited Feb. 11, 2020). Seronegative rheumatoid arthritis refers to "the diagnosis of rheumatoid arthritis without the presence of certain antibodies in the patient's blood." Jennifer Freeman, M.D., *Seronegative RA: What are the Symptoms of Seronegative RA?*, https://www.rheumatoidarthritis.org/ra/types/seronegative/ (last visited Feb. 11, 2020).

[6] Methotrexate is used "along with rest, physical therapy, and sometimes other medications to treat severe active rheumatoid arthritis." *See Methotrexate*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682019.html (last visited Feb. 11, 2020). Methotrexate is in a class of medications called antimetabolites and may treat rheumatoid arthritis by decreasing the activity of the immune system. *See id.* Methotrexate is considered a "disease-modifying antirheumatic drug[,]" which can "slow progression of rheumatoid arthritis and save the joints and other tissues from permanent damage." *See Rheumatoid Arthritis*, Mayo Clinic *supra* note 5.

and that Ruiz was experiencing pain in her left sacroiliac area[7] and right wrist. (R. 486.) Dr. Reddy increased Ruiz's dose of methotrexate to 15 mg per week. (*Id.*)

In September 2013, Ruiz underwent x-rays of her wrists, sacroiliac joints and hands. (R. 506-08.) There was no radiographic evidence of rheumatoid arthritis in either her hands or her wrists. (R. 506, 508.) There was evidence of osseous (bone) erosions and subchondral sclerosis[8] on the iliac sides of both sacroiliac joints, but no significant interval changes from prior images and no evidence of widening or fusion across either sacroiliac joint. (R. 507.) Dr. Reddy increased Ruiz's dose of methotrexate to 17.5 mg per week. (*See* R. 516 (June 2014 treatment notes referencing dose increase in September 2013).)

During a follow-up visit in June 2014, Dr. Reddy noted improved arthritis symptoms and that Ruiz's morning stiffness had decreased to fifteen minutes and her right elbow pain was mild. (R. 516-17, 520-21.) Dr. Reddy continued Ruiz on 17.5 mg per week of methotrexate and recommended continued home exercise for shoulder and back pain. (R. 516.) In January 2015, Dr. Reddy noted that Ruiz had tried to switch to receiving methotrexate through subcutaneous injections instead of orally, but that she was unable to do so. (R. 548.) Dr. Reddy also noted that

---

[7] Sacroiliac joints link the pelvis and lower spine and are made up of the sacrum — the bony structure above the tailbone and below the lower vertebrae — and the top part (ilium) of the pelvis. There are sacroiliac joints in both the right and left sides of the lower back. *Sacroiliac Joints*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sacroiliitis/multimedia/sacroiliac-joints/img-20005962 (last visited Feb. 12, 2020).

[8] Subchondral sclerosis is the hardening of the bone just below the cartilage surface. *See* Marjorie Hecht & *medically reviewed by* William Morrison, M.D., *What Is Subchondral Sclerosis?*, Healthline, https://www.healthline.com/health/subchondral-sclerosis#causes (last visited Feb. 12, 2020).

Ruiz's joint pain was doing well, but she continued to have some pain in her shoulders and back.[9] (*Id.*)

In May 2015, Dr. Reddy noted that Ruiz had not been taking methotrexate since January and that, off the medication, her arthritis had worsened. (R. 667.) Dr. Reddy also noted that Ruiz was experiencing morning stiffness for approximately thirty minutes to one hour. (*Id.*) Dr. Reddy again recommended that Ruiz switch to methotrexate injections, which Ruiz indicated her outside doctor could administer.[10] (R. 669.) Ruiz also was given methotrexate to take orally in case the injections were not possible. (*Id.*) Dr. Reddy also discussed with Ruiz the possibility of TNF inhibitors.[11] (*Id.*)

In June 2015, Ruiz saw Dr. Reddy for a follow-up visit reporting morning stiffness lasting ten minutes to one hour in her left elbow and shoulders, depending on the weather. (R. 524.) Dr. Reddy's treatment plan remained unchanged. (R. 524-25.) The same month, Ruiz began receiving methotrexate injections at Morrisania Diagnostic & Treatment Center. (R. 462-63, 663.) At her next appointment with Dr. Reddy in August 2015, Ruiz reported continued pain in her hands, feet, neck and hips and mild joint swelling, with no improvements in morning stiffness. (R. 661.)

---

[9] The note from this visit appears to be cut off and is not contained elsewhere in the record.

[10] Beginning in June 2015, Ruiz received methotrexate injections at Morrisania Diagnostic & Treatment Center. (*See* R. 462-63, 617-27; *infra* Background Section III(B).)

[11] TNF inhibitors are a group of medications used to treat inflammatory conditions such as rheumatoid arthritis. Ali Duarte, M.D. & *reviewed by* the Am. C. of Rheumatology Comm. on Comm. & Mkt., TNF Inhibitors, American College of Rheumatology, https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/TNF-Inhibitors (last visited Feb. 12, 2020). Ruiz had latent tuberculosis ("TB"), which meant that she was infected with the TB bacterium, but did not have symptoms of the disease. *See Reynolds v. Goord*, 103 F. Supp. 2d 316, 319 (S.D.N.Y. 2000). There is an increased risk of TB reactivation if TNF inhibitors are administered to a patient with latent TB. *See* M. Fallahi-Sichani, J. Flynn, J. Linderman and D. Kirschner, *Differential Risk of Tuberculosis Reactivation among Anti-TNF Therapies Is Due to Drug Binding Kinetics and Permeability*, J. Immunol. (April 1, 2012) *available at* https://www.jimmunol.org/content/188/7/3169.long (last visited Feb. 12, 2020).

Dr. Reddy noted that the injections has not yet resulted in improvement, but that it had only been one month. (R. 663.)

In November 2015, Dr. Reddy noted improvement of the joint pain in Ruiz's hips but that Ruiz still experienced occasional significant pain in her hands, elbows and shoulders, as well as neck pain, though no joint swelling of her hands. (R. 651.) Dr. Reddy also noted that the chest clinic recommended that Ruiz start treatment for latent TB (which would enable her to start the TNF inhibitor), but Ruiz wished to continue only with methotrexate. (R. 653; *see also* R. 657-59.) Renewed x-rays in November 2015 were normal for Ruiz's hands and showed no change from the September 2013 x-rays for either her right elbow or sacroiliac joints. (R. 647; *see also* R. 671-73.)

During a follow-up appointment in February 2016, Dr. Reddy noted that she previously had increased Ruiz's dose of methotrexate to 20 mg per week with continued improvement on the higher dose, though Ruiz still experienced joint pain in her elbow and shoulders and morning stiffness lasting approximately thirty minutes. (R. 646.) Dr. Reddy increased Ruiz's dose of methotrexate to 22.5 mg per week. (R. 648.) In May 2016, Dr. Reddy noted improvement of Ruiz's arthritis symptoms and that she continued to receive weekly injections of methotrexate. (R. 641.) In August 2016, Dr. Reddy noted that Ruiz was continuing with the weekly injections with "fair control" of her arthritis. (R. 636.)

### B. Morrisania Diagnostic & Treatment Center Treatment Records

Since at least February 2013, Ruiz received treatment at Morrisania Diagnostic & Treatment Center for hypertension, sickle cell trait, leiomyoma of the uterus and unspecified deficiency anemia. (R. 461-81, 608-631.) During a visit on July 21, 2014, Dr. Fernando Mora-

McLaughlin, M.D., indicated a diagnosis of rheumatoid arthritis (seronegative) and noted that Ruiz was receiving treatment. (R. 466.) On June 4, 2015, Dr. Mora-McLaughlin initiated subcutaneous methotrexate injections at the request of Ruiz's rheumatologist. (R. 462-63.) Between June and September 2015, Dr. Mora-McLaughlin administered methotrexate injections to Ruiz. (R. 617-27.)

On October 23, 2015, Dr. Arturo Batlle saw Ruiz for a follow-up appointment and noted that she had complete independence in activities of daily living, normal findings upon physical examination and that her hypertension was controlled. (R. 615.) These findings remained unchanged in December 2015 when Dr. Batlle saw Ruiz for lab work. (R. 611-13.) In May 2016, Dr. Mora-McLaughlin saw Ruiz for a follow-up appointment. (R. 608-10.) Dr. Mora-McLaughlin recommended continued care with the same medications. (R. 609.)

### C. Dr. Fernando Mora-McLaughlin, M.D. – July 2015 Opinion

In July 2015, Dr. Mora-McLaughlin completed an evaluation of Ruiz. (R. 571-76.) Dr. Mora-McLaughlin noted that Ruiz experienced daily fatigue and that, once the fatigue begins, she must rest two to four hours per day. (R. 571, 575.) Dr. Mora-McLaughlin also noted that Ruiz had an antalgic gait and experienced gastrointestinal side effects from some medications. (R. 575.) Dr. Mora-McLaughlin opined that Ruiz was limited to occasionally lifting and carrying (but did not specify any particular weight); was limited in her ability to stand and/or walk to less than two hours per day; was limited in her upper extremities; and was limited with respect to her hands. (R. 576.)

**D.**     **Carol McLean Long, M.D. – July 2015 Consultative Examination**

On July 25, 2015, Dr. McLean Long conducted a consultative examination for Ruiz. (R. 579-83.) In terms of daily activities, Dr. McLean Long noted that Ruiz was able to do some cooking three days per week, a little bit of cleaning one day per week, and laundry once per week, though Ruiz did not shop or perform child care. (R. 580.) Dr. McLean Long also noted that Ruiz could shower and dress herself, but needed help especially when she had to lift her arm. (*Id.*) Upon examination, Dr. McLean Long noted that Ruiz appeared to be in mild distress and has a slow gait. (R. 581.) She also noted various musculoskeletal limitations and that Ruiz had difficulty with zippers, buttons, ties and velcro, though her hand and finger dexterity were intact. (R. 581-82.) Dr. McLean Long concluded that Ruiz had mild limitations in her ability to sit, stand, climb, push, pull and carry heavy objects; moderate to marked limitations in her ability to flex and extend her elbows bilaterally; and moderate limitations in her ability to reach up, out and backward, and to flex and extend her neck. (R. 583.)

**E.**     **Columbus Center For Medical Rehabilitation**

In 2017, Ruiz underwent an ultrasound on her upper extremities due to pain in her shoulders. (R. 685-90.) The shoulder ultrasound indicated a tear of the biceps tendon in her right arm, but no gross abnormalities on the left side. (R. 688.) A second ultrasound of the elbows indicated cortical irregularity and tendinosis[12] on the right and no obvious abnormalities on the left. (R. 699-700.) Ruiz also underwent a videonystagmography,[13] which was normal. (R. 703.)

---

[12] Tendinosis is defined as "[d]egenerative lesions of a tendon without inflammation or symptoms . . .. It usually progresses to inflammation (tendinitis) and, eventually, a tendon rupture." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 258 n.16 (S.D.N.Y. 2010) (citation omitted).

[13] Videonystagmography is a series of tests used to determine the causes of a patient's dizziness or balance disorders. The test works by documenting a person's ability to follow visual objects with their eyes and

### F.        Montefiore Medical Center

On August 1, 2017, Ruiz was seen at Montefiore Medical Center for pain in her right elbow. (R. 774-79.) Dr. Konrad Gruson, M.D., noted that Ruiz had no pain at rest and that she was not taking any medication for pain. (R. 774.) He also noted a normal gait. (*Id.*) Dr. Gruson noted no tenderness in the trapezius muscles and 5/5 strength in elevation and external rotation without pain or resistance. (R. 775.) As for the Ruiz's elbow, Dr. Gruson noted limited range of motion in the right elbow and limited supination[14] of the right forearm, but no effusion. (R. 775.) An x-ray of the right elbow showed severe arthritic changes. (R. 778-79.) Dr. Gruson referred Ruiz to a colleague who specialized in elbow reconstruction for further evaluation and management. (R. 775.)

On August 4, 2017, Ruiz was seen by Dr. Albert Panozzo, M.D., for an evaluation of her elbow. (R. 780-82.) Dr. Panozzo noted that Ruiz had no pain at rest, but experienced pain with attempted motion. (R. 780.) He further noted that Ruiz had normal function of the shoulder, wrist and fingers. (R. 780.) Dr. Panozzo administered a corticosteroid injection.[15] (R. 780-81.)

## IV.      The November 8, 2017 Administrative Hearing

At the administrative hearing on November 8, 2017, Ruiz testified that she did some tidying up around her apartment, including some cooking and light dishes, but that her son helped her with mopping, some aspects of cooking, such as cutting meat, and laundry. (R. 66.)

---

how well the eyes respond to information from the vestibular system. *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 481 n.6 (2d Cir. 2013) (citation omitted).

[14] Applied to the hand, supination refers to the act of turning the palm forward or upward by lateral rotation of the forearm. *See Dorland's Illustrated Medical Dictionary* 1804 (32nd ed. 2012).

[15] A corticosteroid acts as an anti-inflammatory. *Gaiser v. Comm'r of Soc. Sec.*, No. 13-CV-08234 (HBP), 2015 WL 3536604, at *4 n. 15 (S.D.N.Y. June 5, 2015) (citation omitted).

Ruiz testified that she could not lift her right arm and could lift her left arm by herself, though she had some "issues" with the left arm. (R. 67-68.) She testified that she had difficulty with buttons, ties and velcro because she could not bend her arm and when asked where her body felt weak, responded her "right arm." (R. 68-69.) Ruiz testified that she lives in a walk-up building and walks for exercise, and that walking helped her feel better. (R. 61-62, 71.) She further testified that she sometimes wakes up with a stiff neck and pain from her arm to her shoulders that can last for weeks. (R. 69.) Ruiz testified that this pain often came about when the weather changed or she was near an air conditioner. (*Id.*) She also testified that she sometimes experienced dizziness or vertigo when she heard loud noises or when her inflammation was high. (R. 70.) As for her ability to work, Ruiz testified that she could not do an easier job because her joints and lower back hurt. (R. 71.) She also testified that she had difficulty using her hands and could not use her arms or hands more than two hours per day. (*Id.*)

Vocational expert ("VE") Marian Marracco also testified at the hearing. (R. 72-88.) The ALJ asked the VE to assume a hypothetical person with the same age, education and work experience as Ruiz and limited to light work with the following additional limitations: right-hand dominant; can never reach overhead with upper right extremity, but can occasionally reach in all other directions, handle and finger and frequently feel; can frequently reach in all directions, handle, finger and feel with upper left extremity; can not push or pull with upper right extremity, but has no limitation on pushing/pulling with upper left extremity; can frequently climb ramps and stairs, but never ropes, ladders or scaffolds; can occasionally balance; can never crawl; can frequently stoop, kneel and crouch; is limited to jobs that do not require fine hearing; must avoid workplace hazards such as unprotected heights, moving mechanical parts, occupational driving or operating

11

motorized moving equipment; must avoid frequent exposure to extreme cold and heat; and would be off-task five percent of the time in an eight-hour work day. (R. 73.)

The VE testified that such a hypothetical person could perform Ruiz's past work as a "case aide."[16] (R. 72-75.) The VE noted that, in her opinion, a case aide would not need to reach overhead. (R. 75.) The VE also testified that there were other jobs in the national economy that such a person could perform, including office helper, furniture rental clerk and dispatcher router. (*Id.*) The VE testified that the job of furniture rental clerk could be performed even without the use of the dominant right arm and that a person with no use of the dominant arm also could perform the job of school bus monitor or usher/ticket taker. (R. 75-76.)

Returning to the first hypothetical and assuming limited use of the dominant arm, but instead limiting the hypothetical person to sedentary work, the VE testified that such hypothetical person could perform the jobs of call-out operator, information clerk and food and beverage order clerk. (R. 76-77.) If such person also was limited to no use of the dominant right arm, the VE testified that the person still could perform the job of information clerk. (R. 77.) The VE testified that, in her opinion, an individual performing these jobs at the unskilled level could be off task less than 10 percent of the time and absent twice per month. (R. 77-79.) As for the job of case aid, which is semi-skilled, the VE testified that a person could be off task between ten and fifteen percent. (R. 79.)

The VE also testified that if the hypothetical person was limited in her ability to communicate in English, it would eliminate the jobs of information clerk, order clerk, usher and

---

[16] While the VE described Ruiz's prior work handing out flyers as a case aide, Plaintiff contends that a more appropriate occupational title would be advertising-material distributor. (*See* Pl.'s Mem. at 19-20.)

callout operator; erode by fifty percent the jobs of furniture rental clerk and erode (by an unspecified amount) the job of school bus monitor, but not affect the job of router. (R. 79-80, 86-87.)

## V.    ALJ Suna's Decision And Appeals Council Review

Following the five-step process, *see infra* Legal Standards Section II, ALJ Suna determined that Ruiz did not have a disability within the meaning of the Act. (R. 26-43.) The ALJ found at step one that Ruiz had not engaged in substantial gainful activity during the period from her alleged onset date to the date of his decision. (R. 29.) At step two, the ALJ determined that Ruiz had the following severe impairments: seronegative rheumatoid arthritis; hypertension; anemia; and sickle cell trait. (*Id*.) The ALJ also considered Ruiz's history of bilateral otosclerosis and hearing loss, but found them to be non-severe impairments. (R. 29-30.)

At step three, the ALJ found that Ruiz did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 30.) In making this decision, the ALJ considered Listings 7.05 for Hemolytic Anemias (including sickle cell anemia) and Listing 14.09 for Inflammatory Arthritis, as well as Listing 4.00H regarding hypertension. (R. 30-31.)

The ALJ then assessed Ruiz's Residual Functional Capacity ("RFC") and determined that she was able to perform light work[17] with the following limitations: Ruiz is right-hand dominant, but can never reach overhead with her upper right extremity and can occasionally reach in all other directions; she can occasionally handle and finger and frequently feel with her upper-right

---

[17] Light work involves lifting and carrying 20 pounds occasionally and 10 pounds frequently. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b). It also generally requires standing/walking at least six hours a day and sitting the remainder of the day. *See* Social Security Ruling 83-106, at *5-6 (1983 WL 31251).

extremity; she can frequently reach in all directions, handle, finger and feel with her upper-left extremity; she cannot push or pull with her upper right extremity, but has no limitation with her upper-left extremity for pushing and pulling; she can frequently climb ramps and stairs, but can never climb ladders, ropes or scaffolds; she can balance occasionally; she can frequently stoop, kneel and crouch, but can never crawl; she can tolerate up to moderate noises and must avoid workplace hazards such as unprotected heights, exposure to moving mechanical parts, occupational driving and driving/operating moving motorized equipment; she must avoid frequent exposure to extreme cold and extreme heat; and, in addition to normal breaks, will be off task five percent of the time in an eight-hour workday. (R. 31.) Based on this RFC, the ALJ concluded at step four that Ruiz could perform her past work as a case aide. (R. 39-40.) In the alternative, the ALJ found, at step five, that Ruiz could perform other jobs in the national economy. (R. 40-43.) Thus, the ALJ concluded that Ruiz was not disabled. (R. 43.)

Following the ALJ's December 22, 2017 decision, Ruiz sought review from the Appeals Council, which denied her request on August 20, 2018. (R. 1-3.) In denying review, the Appeals Council reviewed additional evidence submitted by Ruiz, namely a Physician's Order for Personal Care/Consumer Directed Personal Assistance Services, dated July 11, 2018, in which Dr. Mora-McLaughlin recommended that Ruiz receive services to assist with skilled tasks, personal care and/or light housekeeping. (R. 9-11.) In addition, Ruiz submitted a Proposed Plan of Care from Village Care Max to provide paraprofessional services.[18] (R. 16.) The Appeals Council reviewed

---

[18] "As part of its Medicaid program, New York offers beneficiaries the opportunity to procure personal care services [ ], whereby qualified individuals can obtain the services of an in-home personal care aide to provide some or total assistance with personal hygiene, dressing[,] and feeding; nutritional and environmental support functions; and health-related tasks." *Woods v. Tompkins Cty.*, No. 16-CV-00007 (LEK) (TWD), 2019 WL 1409979, at *3 (N.D.N.Y. Mar. 28, 2019) (citing N.Y. Soc. Serv. Law § 365–a(2)(e);

this evidence, but determined that it did not show a reasonable probability that it would change the outcome of the decision. (R. 2.)

## LEGAL STANDARDS

### I.    Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does [the Court] determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejeda v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is a very deferential standard of review—even

18 N.Y.C.R.R. § 505.14(a)) (internal quotation marks omitted); *see also Stroucher v. Shah*, 891 F. Supp. 2d 504, 507-09 (S.D.N.Y. 2012) (discussing Medicaid program in New York City); *Hanley v. Zucker*, No. 15-CV-05958 (KBF), 2016 WL 3963126, at *2 (S.D.N.Y. July 21, 2016) (discussing eligibility for Medicaid in New York).

more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, No. 17-CV-01366, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.     Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the

claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d

1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation

process, the evaluation will not progress to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4). After the first three steps (assuming that the claimant's impairments do not meet

or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC

"based on all the relevant medical and other evidence in [the claimant's] case record." 20

C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51

## III.    The Treating Physician Rule[19]

An ALJ must follow specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether a treating physician's opinion is entitled to controlling weight. *See id.* The ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not

---

[19] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Ruiz's claims were filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Report & Recommendation, the Court is referring to the version of the regulations effective before March 27, 2017.

consistent with other substantial evidence in the record, [including] the opinions of other medical experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the ALJ must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95. "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted). The ALJ also may consider other factors, such as the source's knowledge of disability programs and familiarity with the case record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Halloran*, 362 F.3d at 32 (listing regulatory factors).

At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v.*

*Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32.).

**VI.    The ALJ's Duty To Develop The Record**

Because social security proceedings are "essentially non-adversarial," the ALJ has an affirmative duty to develop the record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal citation omitted); *see also Rosa*, 168 F.3d at 79 ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history."). An ALJ "must ensure that "[t]he record as a whole [is] complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." *Casino-Ortiz v. Astrue*, 06-CV-00155 (DAB) (JCF), 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1513(e)(1)-(3)). This duty exists even if the claimant is represented by counsel. *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

The duty to develop the record is even more important when the information concerns a claimant's treating source. *See Ulloa*, 2015 WL 110079, at *11 (citation omitted). This is because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20 C.F.R. § 416.927(c)(2)).

**<u>DISCUSSION</u>**

Plaintiff argues that her case should be remanded to the SSA for a calculation of benefits because: (1) the ALJ failed to appropriately weigh the opinions of Ruiz's treating physicians; (2) the ALJ erroneously found Ruiz's impairments did not meet or equal the listing for inflammatory arthritis; (3) the ALJ disregarded Ruiz's testimony without making a credibility determination based on her work history; (4) the ALJ's decision is not supported by substantial evidence; (5) the ALJ erred in finding that Ruiz could perform her previous work; and (6) the ALJ failed to adequately develop the record. (Pl.'s Mem. In Support Mot. For J. On The Pleadings ("Pl.'s Mem."), ECF No. 15-1.) In opposition to Plaintiff's motion, and in support of his cross-motion, the Commissioner argues that the ALJ's decision is free of legal error and supported by substantial evidence. (Comm'r Mem. In Opp. To Pl.'s Mem. And In Support Cross-Motion For J. On The Pleadings ("Comm'r Mem."), ECF No. 21.)

For the reasons set forth below, the Court finds that the ALJ erred by failing to comply with the treating physician rule and failing to adequately develop the record with respect to Ruiz's functional limitations.

**I.** **<u>The ALJ Erred By Failing To Comply With The Treating Physician Rule And Failing To Adequately Develop The Record</u>**

Plaintiff argues that the ALJ violated the treating physician rule because: (1) he gave partial, rather than controlling, weight to the opinion of Dr. Mora-McLaughlin without good reasons for doing so and without giving good reasons for the weight assigned, and (2) he disregarded opinion evidence from Dr. Reddy. (Pl.'s Mem. at 9-13.) The Commissioner argues that the ALJ is not required to give controlling weight to a treating source's medical opinion that is not supported by medical evidence or is contradicted by other substantial evidence in the

record and that the ALJ is entitled to use discretion in weighing the medical evidence as a whole. (Comm'r Mem. at 18.) For the reasons set forth below, the Court finds that the ALJ failed to comply with the treating physician rule in considering Dr. Mora-McLaughlin's opinion and that the case should be remanded for further development of the record.

### A.    Dr. Mora-McLaughlin

The ALJ gave Dr. Mora-McLaughlin's opinion partial weight. (R. 38.) The ALJ recognized that Dr. Mora-McLaughlin was a treating physician who had some insight into Ruiz's condition and that the record contained treatment notes from Dr. Mora-McLaughlin documenting Ruiz's symptoms. (*Id.*) The ALJ explained that he did not give Dr. Mora-McLaughlin's opinion greater weight because Dr. Mora-McLaughlin failed to provide support for his opinions with an explanation; lacked Social Security program knowledge; and because his statements about Ruiz's limitations in lifting, carrying, pushing and pulling were vague. (*Id.*) While the Commissioner is not required to give controlling weight to a treating source's medical opinion that is not supported by medical evidence or is contradicted by other substantial evidence in the record, *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), here, the ALJ did not discuss whether or not Dr. Mora-McLaughlin's opinions were supported by the record, nor did he cite to any evidence in the record that he believed was inconsistent with the treating physician's opinions. (R. 38.)

To the extent that the ALJ thought that Dr. Mora-McLaughlin's opinions were vague, the ALJ had a duty to develop the record to obtain clarifying information. *See Sanchez v. Comm'r of Soc. Sec.*, No. 18-CV-02027 (KMK), 2019 WL 4673740, at *7 (S.D.N.Y. Sept. 25, 2019) (vagueness alone not good reason to afford less than controlling weight to treating physician's opinion given ALJ's duty to develop record) (citing *Page v. Colvin*, No. 15-CV-00792 (KNF), 2015 WL 9660016, at

*5 (S.D.N.Y. Dec. 10, 2015)). Similarly, the fact that the treating physician "failed to provide support for his opinions with an explanation[,]" is not a good reason for rejecting them. *See Collins v. Berryhill*, No. 17-CV-00467, 2019 WL 2287787, at *4 (W.D.N.Y. May 28, 2019) ("the fact that a physician left her opinion unexplained on a form does not mean that it is not 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and thus not entitled to controlling weight. . . . [n]or does it mean that her opinion is unsupported by medical signs and laboratory findings.") (citations omitted). If the ALJ was concerned that Dr. Mora-McLaughlin's opinion "lacked proper clinical foundation, the ALJ was obligated to follow-up with him before discounting his opinion." *Arvanitakis v. Comm'r of Soc. Sec.*, No. 12-CV-01232 (CBA), 2015 WL 2240790, at *12 (E.D.N.Y. May 12, 2015) (citing cases); *see also Cepeda v. Berryhill*, No. 18-CV-07304 (LGS) (SLC), 2019 WL 7483937, at *12 (S.D.N.Y. Dec. 12, 2019), *report and recommendation adopted*, 2020 WL 58236 (S.D.N.Y. Jan. 6, 2020) ("A treating physician's failure to include objective support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the decision of the case.") (internal citation and quotation marks omitted).

Further, even if the ALJ was entitled to give Dr. Mora-McLaughlin's opinion less than controlling weight, he was required to provide "good reasons" for the weight assigned. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, other than finding that Dr. Mora-McLaughlin's opinions were vague or lacked an explanation, the only reason the ALJ gave for assigning Dr. Mora-McLaughlin's opinions partial weight is that Dr. Mora-McLaughlin lacked Social Security program knowledge. (R. 38.) While a lack of program knowledge is one factor the ALJ considers

in determining the weight assigned to a treating physician's opinion, *see Grimmer v. Comm'r of Soc. Sec.*, No. 18-CV-01155 (DB), 2019 WL 6490841, at *5 (W.D.N.Y. Dec. 3, 2019) (ALJ may consider lack of Social Security program knowledge in discounting a treating source opinion) (citing 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6)), it is not clear how such knowledge is relevant to the particular opinions at issue here, which primarily are medical in nature and not couched in language unique to the Social Security program. The ALJ did not discuss the other factors set forth in the regulations, including, most notably, the amount of medical evidence supporting Dr. Mora-McLaughlin's opinions or the consistency of his opinions with the remaining medical evidence. *See Burgess*, 537 F.3d at 129.

The Court recognizes that an ALJ is not required to engage in a "slavish recitation" of each of the regulatory factors. *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013). Nonetheless, where it is not otherwise clear that the ALJ complied with the substance of the treating physician rule, remand is appropriate. *See Estrella*, 925 F.3d at 96; *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

The Commissioner argues that the ALJ discussed the contrary opinion of the consultative examiner, Dr. McLean-Long, and referenced treatment notes, exam findings and testing results demonstrating a capacity for work at a light exertional level, which constituted good reasons for the ALJ's decision. (Comm'r Mem. at 19.) But the ALJ did not state that he discounted Dr. Mora-McLaughlin's opinions based on conflicting opinions of the consultative examiner or attempt to

compare the opinions at all. (*See* R. 38.) In any event, while the consultative examiner's opinion that Ruiz had a "mild" limitation in her ability to sit/stand might be substantial evidence to contradict Dr. Mora-McLaughlin's opinion that Ruiz was limited to sitting/standing less than two hours per day, *see e.g., Bonilla Mojica v. Berryhill*, 397 F. Supp. 3d 513, 534 (S.D.N.Y. 2019) (opinion of consultative examiner can constitute substantial evidence),[20] it is unclear how the opinions compare in terms of Ruiz's ability to push, pull and reach since Dr. Mora-McLaughlin's opinions are either vague or absent as to these functions and the examiner's opinion of mild to moderate limitations also are vague. Moreover, the consultative examiner did not offer an opinion as to other issues identified by Dr. Mora-McLaughlin, such as the extent to which Ruiz was limited by fatigue, and thus her opinion cannot be a good reason for discounting the entirety of Dr. Mora-McLaughlin's opinion.

In addition, the ALJ did not cite to any treatment notes, testing results or examination findings in his discussion of the weight to assign Dr. Mora-McLaughlin's opinions. (R. 38.) The portion of the ALJ's decision cited by the Commissioner pertains to the ALJ's credibility determination and, even then, he did not cite to any specific medical records. (*See* Comm'r Mem. at 19 (citing R. 38.)) Thus, the Court cannot conclude, as the Commissioner maintains, that the ALJ reasonably found Dr. Mora-McLaughlin's opinions unsupported or provided good reasons for discounting them. (Comm'r Mem. at 19 (citing R. 38).)

Because Dr. Mora-McLaughlin's opinions as to Ruiz's ability to lift, carry, push, pull and use her hands are vague, the Court cannot speculate as to whether the ALJ's failure to comply

---

[20] *But see, e.g., Garretto v. Colvin*, No. 15-CV-08734 (HBP), 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) (consultative examiner's opinion that claimant had "moderate" limitations in ability to sit and stand too vague to support ALJ's determination that claimant could perform sedentary work).

with the requirements of the treating physician rule is harmless. *See Zabala*, 595 F.3d at 409 (error in application of treating physician rule harmless if "application of the correct legal standard could lead to only one conclusion."). The Commissioner argues that the ALJ's RFC determination is consistent with Dr. Mora-McLaughlin's opinions, but the Court finds the opinions too vague to reach that conclusion. Thus, the Court finds that remand for further development of the record is warranted. *See Barrie on behalf of F.T. v. Berryhill*, No. 16-CV-05150 (CS) (JCM), 2017 WL 2560013, at *10 (S.D.N.Y. June 12, 2017) ("[U]ntil an ALJ satisfies the threshold requirement under the duty to develop the record, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule.") (internal citation and quotation marks omitted).[21]

The Commissioner also argues that Dr. Mora-McLaughlin's other opinions, such as his opinion regarding Ruiz's fatigue, were not supported by examination findings. (Comm'r Mem. at 20.) However, the only medical evidence to which the Commissioner cites is one treatment note from an April 2015 pre-operative examination, prior to Ruiz's right ear surgery, indicating that Ruiz denied fatigue. (Comm'r Mem. at 20 (citing R. 540).) The Court finds that this single note does not constitute substantial evidence to contradict the treating physician's opinion.

---

[21] Similarly, without a clear functional assessment from a treating source, the Court finds that the current record, though it contains extensive treatment notes, is inadequate to assess critical aspects of Ruiz's RFC such as her ability to lift, carry, push and pull. *See Stellmaszyk v. Berryhill*, No. 16-CV-09609 (DF), 2018 WL 4997515, at *24 (S.D.N.Y. Sept. 28, 2018) (record inadequate when no functional assessment from treating source and consultative examiner did not provide detailed explanation of plaintiff's physical limitations); *see also Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-00169 (FJS), 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) (record insufficient to determine RFC when no statement from treating physician regarding plaintiff's functional abilities to work); *Jeanniton v. Berryhill*, No. 15-CV-05145 (DLI), 2017 WL 1214480, at *9 (E.D.N.Y. Mar. 31, 2017) (recognizing ALJ's failure to request formal opinions from treating physicians not "reflexively fatal" where record contained sufficient evidence for ALJ to assess petitioner's RFC but remanding when record was not otherwise sufficient) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (internal quotation marks omitted)).

Moreover, as the Commissioner recognizes (*see* Comm'r Mem. at 20), by the time of the ALJ's decision, there was additional evidence in the record that Ruiz experienced fatigue, which the ALJ did not address. (R. 720, 724, 732, 758.) While the ALJ is entitled to weigh conflicting evidence, he is required to provide good reasons for the weight ultimately assigned to a treating physician's opinions. This requirement "exists, 'in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable.'" *Price v. Comm'r of Soc. Sec.*, No. 14-CV-09164 (JPO), 2016 WL 1271501, at *4 (S.D.N.Y. Mar. 31, 2016) (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Such transparency is lacking here. Moreover, because fatigue can impact a person's functional capacity in various ways, the Court cannot conclude, on the current record, that proper application of the treating physician rule would lead to the same result.[22]

### B.  Dr. Reddy

With respect to Dr. Reddy, Plaintiff argues that the ALJ erred in failing to give any weight to her opinions, which Plaintiff contends are set forth in her treatment notes. (Pl.'s Mem. at 12-13.) Treatment notes can be considered opinions to the extent that they "reflect judgments about the nature and severity of [the claimant's] impairment(s), including [ ] symptoms, diagnosis and prognosis," the claimant's capabilities despite the impairment(s), and any physical or mental

---

[22] For example, to the extent that the ALJ intended to account for fatigue by limiting Ruiz to being off-task five percent of the day, the ALJ provides no explanation to that effect and no basis for his approximation. The ALJ's failure to explain this basis is material because the VE testified that Ruiz would not be able to perform her prior work if she were off-task more than fifteen percent and would not be able to perform other unskilled jobs if she were off-task more than nine percent. *See Sprague v. Berryhill*, No. 17-CV-00948 (FB), 2018 WL 4954091, at *5 (E.D.N.Y. Oct. 11, 2018) (RFC determination not supported by substantial evidence when no basis for ALJ's determination that claimant would be off-task five percent of day based on fatigue).

restrictions. 20 C.F.R. §§ 404.1527, 416.927; *see also Sickles v. Colvin*, No. 12-CV-00774 (MAD) (CFH), 2014 WL 795978, at *4 (N.D.N.Y. Feb. 27, 2014) ("[T]he regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as medical opinions.") (internal citation and quotation marks omitted). Here, the Court agrees with the Commissioner that the records cited by Plaintiff do not reflect Dr. Reddy's judgments about the severity of Ruiz's impairments, or her capabilities or restrictions. Indeed, it is the lack of such a functional assessment that necessitates further development of the record. On remand, the ALJ should seek to obtain a functional assessment from Dr. Reddy, who has been Ruiz's treating rheumatologist for many years and appears to have had the most extensive relationship with her of any of the treating sources in the record. *See Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.") (citing 20 C.F.R. § 416.927(c)(2)); *see also Jeanniton*, 2017 WL 1214480, at *10 ("Treating physician opinions are to be sought and given deference because to obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician.") (internal citation, quotations marks and alterations omitted).

## II.    Plaintiff's Remaining Arguments

Because I find that the ALJ erred in complying with the treating physician rule and that further development of the record is neccesary, I do not consider whether the ALJ's decision is otherwise supported by substantial evidence. *See, e.g., Rivera v. Comm'r of Soc. Sec.*, 728 F. Supp. 2d 297, 331 (S.D.N.Y. 2010) ("Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.") (internal citations omitted). However, I briefly address several of Plaintiff's related arguments, which warrant consideration on remand.

First, Plaintiff argues that the ALJ improperly disregarded Ruiz's testimony regarding the limiting effects of her symptoms without making a credibility finding, and, in particular failed to account for her lengthy work history. (Pl.'s Mem. at 16-18.) The fact that Plaintiff has a good work history does not automatically mean she is entitled to a favorable credibility finding. *See Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) ("Although it is true that a good work history may be deemed probative of credibility, it remains just one of many factors appropriately considered in assessing credibility.") (internal citation and quotation marks omitted). Nonetheless, on remand, the ALJ should consider Ruiz's work history, among other relevant factors, in assessing Ruiz's credibility in light of the entire record. *See Garretto,* 2017 WL 1131906, at *22 (ALJ should re-evaluate plaintiff's testimony after "taking steps to develop the record as directed").

The ALJ also should carefully reconsider whether Ruiz is able to communicate in English. (*See* Pl.'s Mem. at 22.) While Ruiz passed the citizenship test, the record contains little additional evidence of Ruiz's ability to communicate in English and contains conflicting evidence regarding

the extent to which her medical appointments were conducted in English. For example, the treatment notes from Dr. Reddy frequently refer to English as the language used, but then describe Ruiz as Spanish-speaking and reference the use of a phone interpreter. (*See, e.g.*, R. 484-86, 645-47.) On remand, the ALJ should consider this evidence in assessing Ruiz's ability to communicate. *Cf. Martinez v. Comm'r of Soc. Sec.*, No. 18-CV-00580 (SN), 2019 WL 1331399, at *4 (S.D.N.Y. Mar. 25, 2019) (substantial evidence supported determination that plaintiff could communicate in English when, *inter alia*, plaintiff passed citizenship test and medical records indicated preferred language was English); *Bonilla Mojica v. Berryhill*, 397 F. Supp. 3d 513, 523 n.2 (S.D.N.Y. 2019) (assessment forms and medical records indicating plaintiff spoke English and/or was bilingual constituted substantial evidence that plaintiff could communicate in English).

III.     <u>**Remand For Further Proceedings Is Appropriate**</u>

Plaintiff moves the Court to remand for the calculation of benefits. (Pls.' Mem. at 1.) In situations where the Court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision," remand for the calculation of benefits is appropriate. *Michaels v. Colvin*, 621 F. App'x 35, 38-39 (2d Cir. 2015) (quoting *Rosa*, 168 F.3d at 83 (internal quotation marks omitted)); *see also Barthelemy*, 2019 WL 5955415, at *7 ("The court may remand solely for the calculation of benefits when 'the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless.'") (quoting *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999)). However, where "there are gaps in the administrative record or the ALJ has applied an improper legal standard," courts routinely remand to the Commissioner for further development of the evidence. *See id.* (citing *Pratts v. Chater*, 94 F.3d

34, 39 (2d Cir. 1996) (internal quotation marks and alterations omitted). Under the circumstances here, the Court finds that remand for further proceedings is appropriate.

**CONCLUSION**

For the foregoing reasons, Ruiz's motion for judgment on the pleadings is GRANTED IN PART and DENIED IN PART, the Commissioner's cross-motion is DENIED, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED:    February 13, 2020
          New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**